WILLIAM JENKINS v. THE WILMINGTON AND WELDON RAIL-
ROAD COMPANY.

*Damages by Draining Land—Natural Channels—Viewing the
Premises—Challenge—Charge—Practice—New Trial.*

1. The granting or refusal of an application for the jury to view the
   premises which are the subject of injury or accident, lies within
   the sound discretion of the Judge.

2. Objection that a juror is on the prosecution bond of another plaintiff
   in another action, though against the same defendant on a similar
   cause of action, is properly overruled.

3. The Court must put its charge, as to the law, in writing, however
   inconvenient, if the request is made in apt time.

4. Respecting the drainage or diversion of surface water, a railroad
   company enjoys the same (but no greater) privileges as any
   other landowner—that is, a right to cause it to flow in its natural
   channel.

5. Discussion by CLARK, J., and MERRIMON, C. J., as to the rights and
   duties of those draining land and flooding surface water upon the
   lands of others.

MERRIMON, C. J., concurring in part and dissenting in part of the
opinion of the Court.

This was a CIVIL ACTION for damages alleged to have been
caused the plaintiff's lands and crops by reason of the diver-
sion of water upon his lands by the defendant company in
the construction of its road from Scotland Neck to Green-
ville, as set out in the complaint, tried at the December Term,
1891, of MARTIN Superior Court.

When the case was called for trial the defendant made
objection to H. T. Brown, a juror, and alleged for cause that
the said juror was on the prosecution bond of one Everett in
an action against the defendant for flooding said Everett's
land, lying on the same stream as plaintiff's land, and dam-
aged by the same act as that alleged by the plaintiff in this
action.

Cause disallowed, and defendant excepted.

It. also appeared that said juror was related to said Everett. Defendant assigned said relationship to Everett as a cause of challenge.

Cause disallowed, and defendant excepted.

. The defendant then challenged said juror peremptorily.

Having challenged four jurors peremptorily, the defendant offered to challenge one Griffin, a juror, peremptorily, which challenge was not permitted by the Court, and the defendant excepted.

After the jury was empanelled, the defendant moved the Court " that the jury, after the testimony has been finished, be sent, under the direction of the Court, to view the land alleged to be damaged, and the land over which the defendant is alleged to have drained water by the construction of its road, and the said watercourses, so as to damage the lands and crops as set out in the complaint."

It appeared that the land alleged to have been damaged was seventeen miles distant from the court-house.

The testimony in the case was closed late Friday night, and the Court expiring by limitation at 12 M. on Saturday night following, the Judge found that it was impossible to send the jury to view the land and conclude the argument and charge the jury within that time. For these reasons the Court declined to grant the motion. The argument in the cause was concluded about 3 o'clock P. M., Saturday, and the charge about 5 o'clock P. M., the Court holding a continuous session.

The defendant excepted.

It was in evidence that in September, 1888, the defendant company extended its road from Scotland Neck to Greenville, and that for a portion of the way it was constructed through a low pocosin country; that in the construction of said road from the direction of north to south it was constructed through " Devil's Garden," and ditches were dug along and within its right-of-way to what is known as

" Arden Branch;" " Devil's Garden" is a basin, low, de-
pressed formation, covering about two hundred and fifty
acres; it is lower than the immediate surrounding coun-
try; it is surrounded on all sides by a natural elevation or
margin; it has no natural outlet, except that in seasons of
heavy rain-fall a small portion of the water which accumu-
lates in it overflows its margin, the greater part of which
finds its way into "Arden Branch," and thence into "Coburn
Swamp;" before the building of the railroad it stood with
water all the time, varying from half-leg to knee-deep; that
it was covered with a thick, heavy growth, consisting of
pine, maple, bay, gum, gall bushes, reeds, and such like.
It is admitted that " Devil's Garden" was not a watercourse,
and that the water which accumulated and stood in it was
rain-water or surface water.   The evidence tended to show
that the ditches along the defendant's right-of-way drained
all the water of " Devil's Garden," both that along its
right-of-way and that covering the entire basin, south into
" Arden Branch;" that " Arden Branch" discharged its waters
into " Coburn Swamp," which was admitted to be a natural
watercourse; that the low grounds of this swamp where the
railroad crosses it were some two or three hundred yards
wide, with hills on either side eight or ten feet high ; " Coburn
Swamp" was canalled by the adjacent landowners up to within
a short distance from where the railroad crosses it; that
prior to the building of the road it was effectual as a drain-
age-way for said lands; that ten times as much water comes
down the swamp or canal now as before the railroad was
built; the lands along the swamp are cultivated up to the
canal; the lands of the plaintiff are not contiguous to the
railroad, but lie two and one-half miles down " Coburn
Swamp;" the ditches cut by the railroad were wholly within
its right-of-way, and there was testimony tending to show
that they were necessary in the construction of the road-bed
to make the same safe for the transportation of freight and

passengers, and also that the road was properly and skilfully constructed; that "Arden Branch" did not cut the rim or margin of "Devil's Garden," and only served to carry off such water as surmounted the elevation or margin which surrounds it in very wet seasons.

The evidence in regard to the damage was substantially as follows:

The canal was successful as a means of drainage before the railroad was built; since the railroad was built, about thirty-eight acres of land has been overflowed; a crop has not been made on the land since the road was built; not much damage done to the crops in 1888, because the crops were matured before the ditches were dug. In 1889 no crop of any account was made; 1890 was over an average year, and only about a half a crop was made; 1891 was an average year as to rain-fall, and the land was overflowed more than ever before the road was built; the lands are overflowed when there are heavy rains; the water stands in the ditches so that when there is a heavy rain the lands overflow; formerly the ditches would carry off the waters from heavy rains; rains which overflow now formerly did not do so.

Verdict and judgment for plaintiff. Appeal by defendant.

*Mr. Donnell Gilliam*, for plaintiff.
*Mr. James E. Moore*, for defendant.

CLARK, J.: The granting or refusal of the application for the jury to view the premises is a matter which rested in the discretion of the trial Judge. On some occasions it may be very useful and, indeed, almost necessary. It was permitted on the trial of the Cluverius case, 81 Va., 787, and there are many precedents elsewhere for such practice. It was allowed in this State, without objection, on the trial (for murder) of Gooch, 94 N. C., 987, and it has been done in many other cases. On the other hand, it is most usually

unnecessary for any good purpose, and would be productive of delay and expense, and, on occasions, possibly, of irregularities. The matter is one which must be left to the sound discretion of the trial Judge, by whom such motion should only be granted when it shall seem clear to him that it is required in the interest of justice. It is a practice not to be encouraged. In the present case, it would seem that a map of the locality and the evidence of witnesses should have been amply sufficient to convey to the jury an intelligent comprehension of the entire contention of the parties.

The objections to the jurors were properly overruled. It was not a disqualification that a juror was a surety on the prosecution bond of another plaintiff, or related to such plaintiff, in another action against this defendant for a similar cause of action.

The Court below committed error in failing to put its charge, as to the law, in writing when requested, as here, in apt time. *The Code,* § 414. The reason given by the Court that, while it reduced nearly its entire charge to writing, it did not fully comply with the statute, "because it was impracticable to put the whole charge in writing in the time within which it was necessary to conclude the trial," does not cure its failure to observe the requirement of the statute. If there was not time to do so, the Court could, in its discretion, have made a mistrial. The defendant had a right to insist on the entire charge as to the law being put in writing, either to the end that it should be handed to the jury on their retirement (Acts 1885, ch. 137), or to avoid differences between counsel as to its purport, in making up a case on appeal, though this does not require that the recapitulation of the evidence should be put in writing. *Dupree* v. *Insurance Co.,* 92 N. C., 417; *Drake* v. *Connelly,* 107 N. C., 463; *Lowe* v. *Elliott,* 107 N. C., 718.

As the case goes back for a new trial, it is but proper that we should notice some of the general principles which are

applicable to this and similar causes. In doing this, we deem it unnecessary to refer to the multitude of conflicting decisions in other States upon this much debated subject. We are content to accept, in a great measure, the conclusion of such discriminating authors as Mr. Angell (on Watercourses) and others. First, we are of the opinion that, in respect to the drainage or diversion of surface water, a railroad company enjoys the same privileges as any other landowner, but no greater, to be exercised under the same restrictions. and qualifications. Secondly, a railroad company or other landowner has a right to cut ditches and conduct the surface water into a natural watercourse passing through its land, and if this right is exercised in good faith, and in a reasonable manner, for the better adaptation of the land to lawful and proper uses, no damage can be recovered if the lands of a lower owner are injured. Mr. Angell (p. 134) says: "No doubt the owner of land through which a stream flows may increase the volume of water by draining into it, without any liability to damages by a lower owner. He must abide the contingency of increase or diminution of the flow of water in the channel of the stream, because the upper owner has the right to all the advantages of drainage or irrigation reasonably used which the stream may give him."

The foregoing passage is quoted with approval by the Court of Appeals of New York in *Waffle* v. *Railroad Co.*, 53 N. Y., 11. The Court says: "The authorities in this country and England upon this subject are collected and revised by the author, and clearly establish the right claimed by the defendant. *Goodale* v. *Tuttle*, 29 N. Y., 459; *Rawsbron* v. *Taylor*, 11 Exch., 369; *Gannon* v. *Hargadin*, 10 Allen, 106; *Miller* v. *Lanbach*, 47 Penn., 154. A proprietor having the right to reclaim his land by draining the surface water therefrom by ditches discharging into a stream running thereon, which is the natural outlet of the water, the object

of doing so, whether for the erection of buildings, agricul-
ture, or constructing a railroad thereon, is wholly imma-
terial."

The principles thus laid down, are not only founded upon
sound reasoning and natural justice, but they underlie the
entire system of drainage as to surface water in North Caro-
lina, and if they are departed from because of a few "hard
cases" (which are the "quick-sands" of the law), the evil
results by way of vexatious litigation among neighboring
landowners, as well as by doubts and confusion as to their
respective rights and liabilities, will be simply incalculable.
It would amount to a revolution in the law, which, for conve-
nience, as well from a sense of justice, has been tacitly adopted
and acted upon by them for a century or more. This right,
however, must be exercised in a reasonable manner, and this
must necessarily be determined in view of the particular cir-
cumstances of each case. For instance, if the stream is inad-
equate and injury may result to a lower owner, the right to
cut such ditches must be confined strictly to mere surface
water, and the ditches must not be so constructed as to divert
the surface water from a direction in which, by the general
inclination of the land, it naturally flows.

Skilful farmers, in the hill country and in the mountains
of our State, are accustomed to construct hill-side ditches so
as to discharge the surface water through either of two
ravines on opposite sides of a hill, and we are not to be
understood as holding that, in so doing, they incur any lia-
bility to those through whose land the water passes, if the
ditches are made skilfully and with an eye single to afford-
ing the best protection to the land against washing.

In the present case, it is admitted that "the ditch com-
plained of was wholly situate upon the defendant's right-of-
way; that it was necessary; that it was skilfully constructed,
and that it was adequate in its capacity to carry the surface
water into a natural drain," which was not flooded except in

case of a heavy rain-fall, and that it carries off only surface water, that is, the rain-fall, and empties it into the natural channel into which, by the configuration of the land, the rain-fall would naturally go if the land was drained. Whether there was an accumulation of water in "Devil's Garden" to such an extent that the drawing of it off would inflict damage upon the plaintiff, is not a question before us. It had heretofore been drained off, and this action was not brought on that ground. Since such drawing off of the accumulated water, the area of "Devil's Garden" has been, like any other redeemed and drained area, and the defendant's ditches cut for the purposes of its road-bed, it is admitted, only drained the surface water which comes down by rain-fall thereon, and thence upon the right-of-way, and which is conducted by these ditches into a natural channel. It is contended by the defendant that this natural channel (Coburn Swamp) is the drainway of thousands of acres, probably over a hundred thousand, and these ditches only add to it the rain-fall of two hundred and fifty acres, part of which already went into said natural channel before the ditches were cut (the rest having, therefore, been retained in the pocosin and evaporated), and that so infinitesimal an addition to its volume of drainage could not possibly make the channel, by reason of such addition, inadequate. It is further contended by the defendant that, by the uncontradicted testimony, the natural channel of Coburn's Swamp was two hundred yards wide and seven or eight feet deep; that nature had thus furnished a channel more than adequate, hence the flow was sluggish and shallow, and formed a swamp; that the plaintiff seeing this and wishing to utilize a part of the useless bed of the swamp, made an artificial narrower and deeper channel, or canal, within the natural channel or swamp; that, while he had a right to do this, and his enterprise should be encouraged, yet it gives him no right to complain that the defendant, by better and necessary

drainage of its own land, has made the artificial channel inadequate. The defendant asserts that the natural channel was big enough, but that it is the plaintiff's artificial channel which is too small. The plaintiff's contention is equally earnest to the contrary of this, and he also insists that by reason of the cutting of the rim of "Devil's Garden," much water that heretofore collected there from a large area, and which disappeared by way of percolation and evaporation. is now thrown into an inadequate watercourse. The facts are not all admitted or found, and hence we need not express any conclusion beyond the general principles above laid down, as upon another trial the facts will doubtless be more explicitly found.

MERRIMON, C. J. (concurring): I concur in the order of the Court directing a new trial, but I cannot concur in all that is said in the opinion of the Court.

It is unquestionably true that a railroad corporation has the right to cut through and along its right-of-way and keep in repair such appropriate ditches, culverts and appliances as are necessary to carry off the surface water coming upon the right-of-way to a natural drain or outlet adequate to receive it. But it has not the right, by artificial means, to collect, divert and turn such surface water from its natural flow or condition through such ditches into a natural stream or outlet not of sufficient capacity to receive and carry it off without flooding the lands along and adjacent to the banks of such stream to such extent as to destroy, or seriously impair its usefulness and value; nor has it the right to collect, divert and turn surface water not on its own land from land adjacent and near to its right-of-way into such stream, and so flood and injure land situate along and near to the stream. As is said in *Staton* v. *Railroad*, 109 N. C., 337, "A party must submit to the natural disadvantages and inconveniences incident to his land, unless he can in some lawful way avoid

or remove and rid himself of them.   But he has no right, as a general rule, to rid himself of them by shifting them, by artificial means, to the land of another, when naturally and in the order of things they would not go upon such land or affect it adversely."

It seems to me that it would be manifestly subversive of common right and justice to allow the owner of land, as of right, to so collect and turn the surface water upon, or coming upon it into a stream into which it would not naturally go unless by slow percolation through the soil, and thus overflow, flood and destroy the usefulness and value of the land of others situate along such stream.   In such case, the party thus relieving himself of natural disadvantages incident to his own land, would do so by practically enlarging the natural capacity of the stream to the positive injury of other landowners.   He would thus supplement—enlarge—the natural stream by destroying the value of the land of others; he would do so as certainly and palpably as he would injure the land of another adjoining his own, if he were to collect all the surface water on his own by artificial means and thrust it in a body upon the adjoining land.   The law does not allow and will not tolerate such rank injustice, caused either by direct or indirect means.   It will not, however, take notice of the increased flow of the natural stream caused by such diversion of surface water, unless it is so great as to do substantial injury to the lands of persons complaining.   The use of a natural stream by those entitled to have it, must be reasonable—not so large as to really change its size and do substantial injury to others.

In the present case, " Devil's Garden" is not a watercourse; it is a low depression in the surface of the earth, having the shape of a basin; the water accumulating in it did not flow through " Arden Branch" into " Coburn Swamp," a stream on which the plaintiff's land is situate, except so much of it as sometimes overflowed its rim.   Its water seems

to have remained stagnant, except as it escaped mainly by evaporation; it did not go into " Coburn Swamp," generally, at all, except, perhaps, to some slight extent, by percolation through the soil. Before the defendant cut its ditches, the water of "Devil's Garden," it seems, did not swell the flow of " Coburn Swamp" to any considerable extent. The case states that the defendant's ditches, intended to drain its right-of-way, not only drained the latter, but as well turned all the water of " Devil's Garden" into " Coburn Swamp." The evidence tended to prove that, prior to cutting the defendant's ditches, the current of the swamp was effectual as a drainage-way; that afterwards ten times as much water passed down the swamp as before, overflowing the stream and the plaintiff's land, and doing it substantial injury, which did not happen before the ditches were cut.

The defendant had the right, by means of suitable ditches, to drain its right-of-way, and free it of surface water, into the stream called " Coburn Swamp," if the latter was capable of receiving it without doing substantial injury to the plaintiff's land situate near to and adjoining that stream; but if that stream was inadequate for such purpose, and the effect of turning the water on the defendant's right-of-way and of " Devil's Garden " into it was to cause it to overflow to such an extent as to do the plaintiff's land substantial injury, as alleged, then the defendant would be liable to him in damages for such injury.

It is said this stream was adequate for such purpose. But this does not appear. It seems that whether it was or was not, was not made a question on the trial. The evidence went to prove that the swamp where the defendant's road crosses it was two to three hundred yards wide, "with hills on either side eight or ten feet high," but it did not appear that the whole swamp made up and constituted the stream—the current of running water. A material question in the case, as it

appears from the record, is as to the capacity of the stream to receive the water turned into it by the defendant.

The defendant is on no better footing as to the drainage of its right-of-way than a natural person in like case. There is nothing in its charter that purports to give it greater right or advantages in such respect, nor is there anything in its nature or purposes that entitles it to have them. If its purposes and necessities in the interests of the public require that it shall flood and destroy the usefulness of the land of an individual situate at a distance from its right-of-way, it must obtain authority from the Legislature to condemn that land, and pay for it, as it did its right-of-way. It has no right to do injury to a citizen's land simply because it is a railroad corporation. Private property shall not be taken for public uses, except by the due exercise of the power of eminent domain.

It may turn out that the plaintiff is not entitled to recover, but it does not appear from the record before this Court that the defendant is now entitled to judgment, as contended by its counsel.

*Per curiam.* Error.