LEVI MARTIN, Appellee, v. F. W. SCHWERTLEY, H. M. JACKSON, D. A. EMERY, FRANK SNOW, and SIMON FITZPATRICK, Appellants.

**Drainage:** SURFACE WATERS: DAMAGES. The upper proprietor of lands can not rightfully discharge collected surface water upon the lower land in an unusual manner or in unusual quantities to the damage of the lower owner, even though discharged into a natural water course. In this case by a change of the highway culverts therein were discontinued, and because of an embankment large quantities of surface water were collected and held on defendant's land, and by cutting the embankment where the culverts formerly were and letting the water through onto plaintiff's land, thereby destroying his crops, defendant became liable regardless of responsibility for construction of the embankment without openings.

**Joint wrongdoers:** PLEADING: SUBMISSION OF ISSUES. Where one defendant answered disclaiming any participation in the acts of the other defendants, and the other defendants jointly denied lia-

bility, no issue as to individual liability was presented; and submission of the joint liability of all defendants except the one filing a separate answer, and the requiring of a specific finding as to his participation in the wrong, was proper.

**Drainage:** INJURY TO GROWING CROPS: DAMAGES: EVIDENCE. The
3 measure of damages for turning flood water onto growing crops is the difference in value of the crop immediately before and immediately after the injury; and witnesses familiar with the usual yield of like crops and of the condition of the injured crops before and after the injury are competent, on the question of conditions and to estimate the probable diminution of the yield.

*Appeal from Harrison District Court.*—HON. E. B. WOOD-RUFF, Judge.

WEDNESDAY, MAY 15, 1912.

ACTION to recover damages for the alleged wrongful act of defendants in cutting openings through a highway embankment, thus permitting surface water to flow upon and across the plaintiff's land, with the result that his growing crops were seriously injured. There was a verdict for plaintiff in the sum of $625.27, and from a judgment on this verdict the defendants appeal.—*Affirmed.*

*C. W. Kellogg* and *J. S. Dewell,* for appellants.

*C. A. Bolter* and *Roadifer & Arthur,* for appellee.

MCCLAIN, C. J.—During the summer of 1909, the plaintiff was in possession as tenant of a farm of one hundred and sixty acres situated in Harrison county, and had growing on such farm crops of wheat and corn. On the north side of this farm is a highway, and the natural course of the surface water is from higher ground to the north across such highway and upon and over the land occupied by plaintiff. There is evidence tending to show that prior

to the fall of 1908 the surface water from the north crossed the highway through culverts at different places, and flowed in the natural course of drainage across the farm of plaintiff, but that in the fall of that year, at the general request and instance of landowners in the neighborhood, the highway was graded up, the culverts being removed so that the highway constituted a solid embankment, preventing the surface water from the north flowing upon and across his farm, and that the highway remained in this condition without openings through it along the entire north line of plaintiff's farm and for some distance beyond it, when, on July 5, 1909, very heavy rains caused an accumulation of water on the land north of the highway in some places to the depth of two or three feet, and that defendants on the 6th and 7th days of July, while the water was still thus standing north of the highway, cut openings in the embankment at places where there had formerly been culverts, allowing the surface water north of the highway grade to run through with great rapidity and in large volume upon plaintiff's land, with great damage to his crops. For the injury thus occasioned to his crops and to a garden adjacent to his dwelling house on the farm, plaintiff recovered a verdict and judgment against the defendants.

I. The sufficiency of the allegations in the pleadings and of the evidence to sustain this judgment is questioned by counsel for defendants in their complaints with reference to instructions given by the court. Their objections are not to specific portions of the instructions, but to the general theory on which the case was submitted. They contend that the court did not require plaintiff to prove that the construction of the highway embankment in the fall of 1908 was the wrongful act of defendants, but instructed the jury that, although this embankment was at that time constructed by lawful authority, the defendants acted wrongfully in cutting openings through it after the surface water had accumulated

1. DRAINAGE: surface waters: damages:

north of it on July 6 and 7, 1909, and allowing the surface water to flow through and on and over plaintiff's premises "substantially in a greater quantity and velocity and in a different manner than it would have done" if openings had been previously made in the highway embankment where the culverts had formerly been. There was a special finding of the jury that these cuts in the embankment were made at the points where the surface water prior to the construction of the embankment naturally flowed across the highway upon plaintiff's land, and we therefore have this question for consideration, to wit: Was it wrongful on the part of defendants to thus open ways through the embankment for immediate escape of water accumulated by it on the other land north of it, conceding that, if such openings had been made when the embankment was thrown up, or at any time before surface water had accumulated in great quantities on the land to the north, the constructin of such openings would have been proper and fully warranted for the purpose of allowing surface water to flow across the highway in the usual course of drainage. Even though defendants had not constructed the embankment, they were aware of its existence and condition, and they were bound to know that, if it continued in that condition until large quantities of surface water had accumulated by reason of a heavy rainfall, the cutting of these openings would cause damage to the plaintiff, although they might be desirable for the purpose of relieving the land north of the highway of the accumulation of water. The evidence that they appreciated the effect of their action in thus attempting to relieve the land north of the highway of the sudden accumulation of surface water is undisputed.

It is elementary law that one person has not the right to relieve his own property of a mischief by causing a similar mischief to the land of his neighbor. And this is not inconsistent with another rule that if a danger of injury is common to two persons, one of them may avert the in-

jury to himself, although in consequence of his doing so damage results to the other. Thus in the case of *Whalley v. Lancashire & Yorkshire R. Co.* (1884) 13 Q. B. D. 131, it was held that a railroad company which had rightfully constructed an embankment which was imperiled by the accumulation of surface water had no right to open a way for the water through such embankment and thus cause it to be discharged on the adjoining land. And in Pollock on Torts (at page 150) the rule announced in the case just cited is approved in this general statement: "At all events, a man can not justify doing for the protection of his own property a deliberate act whose evident tendency is to cause and which does cause damage to the property of an innocent neighbor. Thus, if flood water has come on my land by no fault of my own, this does not entitle me to let it off by means which in the natural order of things cause it to flood an adjoining owner's land." This is but an application of the well-recognized maxim, "*Sic utere tuo ut alienum non laedas.*" See Broom's Legal Maxims (6th American Ed., 1868) 275.

The rule announced in an early case in this state, that one person may not improve his land for the purpose of freeing it from surface water by throwing the water upon the land of another, to his injury, in a different manner from that in which it would naturally have flowed (*Livingston v. McDonald,* 21 Iowa, 160), has been somewhat modified in the interest of agriculture, so that the upper proprietor may drain his land into a natural water course without liability to a lower proprietor for resulting damages, although the effect of such drainage is to throw the surface water in somewhat increased volume at times on the land of the lower proprietor. *Dorr v. Simmerson,* 127 Iowa, 551; *Hull v. Harker,* 130 Iowa, 190. But the principle has still been maintained that the upper proprietor may not discharge collected water upon lower land, even though in a water course, in an unusual manner or in unusual

quantities. *Tretter v. Chicago G. W. R. Co.,* 147 Iowa, 375; *Hume v. Des Moines,* 146 Iowa, 624; *Baker v. Town of Akron,* 145 Iowa, 485; *Sheker v. Machovec,* 139 Iowa, 1. And this is the general rule in this country. 1 Cooley, Torts (3d Ed., 1906) 1189. It is to be noticed that the case before us does not involve the ordinary question of drainage. The common enemy, surface water, had been accumulated on the lands of defendants in large quantities so as to constitute an immediate menace and mischief, and the defendants had no right to free themselves of the natural consequence of this invasion by a hostile force by transferring the menace and mischief to the land of plaintiff, who was wholly innocent of any wrong in the matter so as to cause him the same kind and quantity of injury as that with which defendants were threatened. It would hardly be pretended that, if a herd of cattle were devastating the crops of one landowner, he would have the right for the purpose of averting further damage to himself to open a partition fence and drive them on the land of an adjoining proprietor who was in no way at fault, with the result of causing to him the same kind of injury which the former was seeking to avert. The accumulated surface water was not mere surface water in the ordinary sense, but it was a present active foe, constrained for the time being on the lands of defendants, threatening unusual and extraordinary danger to some one, and, as turned loose upon the plaintiff's land, it was not ordinary surface water, but a body of water which by its accumulation had become an extraordinary menace.

Counsel argue that the highway embankment without proper openings was a nuisance which the defendants might rightfully abate by their own action, but we find no authority for so abating a nuisance as to throw the resulting injury upon some one else who is in no way at fault for its existence. The act of the defendants was not an instinctive and involuntary act in avoiding the injury

threatened in a sudden emergency as in the celebrated "Squib case" of *Scott v. Shepherd,* 2 W. Bl. 892 (3 Wils. 403), but it was a willful and deliberate act calculated to throw upon the plaintiff, an innocent party, the very injury with which defendants were threatened. This willful and deliberate act, and not the original construction of the highway embankment, which might or might not be injurious to adjoining land owners, depending upon circumstances which should subsequently arise, was the proximate cause of the injury to the plaintiff. See 1 Cooley, Torts (3d Ed., 1906) 101. In the case before us the situation was simply this: Regardless of the responsibility for the original construction of the highway embankment without the openings through it which should have been placed there, the lands of defendant and others were covered with water which had accumulated as the result of a heavy rainfall. Defendants desired to relieve their land immediately of this water, and they cut openings in the embankment with the intention that the water should thereby be cast on the land of the plaintiff otherwise than as it would have been cast upon his land if the openings had been previously made in the embankment, with a full knowledge that damage would result to him similar to that which they were seeking to avoid by making the openings. Under such circumstances, it seems to us there can be no question as to the wrongfulness of defendants' acts and their consequent liability for damage resulting to the plaintiff.

II. The defendant Schwertley filed an answer in his own behalf, disclaiming any participation in the acts of the other defendants. But the other defendants filed a joint answer, denying their liability. No question was raised on the trial as to the liability of any one of the other defendants, if a wrong was done by any of them. Under these circumstances, the court did not err in submitting to the jury the issue as to the joint liability of all the defend-

2. JOINT WRONGDOERS: pleading: submission of issues.

ants save Schwertley, and requiring them to find specifically only as to his participation in the wrong which occasioned the injury to plaintiff. The verdict was against Schwertley and all the other defendants as joint wrongdoers, and there is no specific complaint as to defendant Schwertley. The contention that the evidence tended to show that some of the defendants other than Schwertley did not participate in the joint wrong can not now be considered. There was sufficient evidence to sustain a verdict against all and no issue was raised as to the individual liability of the other defendants.

III. There is some contention on the part of counsel for appellants that the court erred in rulings relating to the admissibility of evidence as to measure of damages.

3. DRAINAGE: injury to growing crops: damages: evidence.

There is no complaint as to the general rule recognized by the court that plaintiff, a tenant with right of occupancy for only one year, should be allowed to recover, if anything, the difference in the value of his crops in the condition existing just before the flood and the condition which existed after the flood, and the only questions raised in this respect are as to whether the witnesses were sufficiently limited in the scope of their testimony.

One witness was allowed to state the condition of plaintiff's growing corn in the latter part of June and others to testify as to its condition about the middle of August. But such testimony was part only of the general description of the plaintiff's corn crop which tended to show that, until it was submerged in water on the 6th and 7th of July, it was a good crop, and that, as the result of being thus submerged it was almost destroyed; the damaged condition in August being the natural consequence of the flood caused by defendants' acts. Witnesses might, therefore, properly testify as to what the value per acre of the crop was in June, and what its value per acre was in August; the diminution in value appearing plainly to have been due to the flood,

and to no other cause. Such evidence would enable the jury to say what the difference in value of the crop was immediately following the damage by the flood. The value per acre of the crop as it was just before the flood might properly be testified to by a witness familiar with the amount of grain which the usual crop would yield, and, as compared with this estimate, he might properly testify as to the actual yield of the portion of the crop which had been damaged; it appearing that the diminution was due to the flood. These suggestions are sufficient to meet the contentions of counsel for appellants without specifically setting out the questions and answers of the various witnesses. The rulings of the court as to the admissibility of the evidence relating to measure of damages are fully supported by the views expressed in *Jefferis v. Chicago & N. W. R. Co.*, 147 Iowa, 124, if it is borne in mind that there was no controversy under the evidence as to the damaged condition of the crops as they existed after the flood, being due to that cause.

We find no error in the record, and judgment is *affirmed*.